AUTOMATIC SWITCH CO. OF BALTIMORE CITY v. CUTTER-HAMMER MFG. CO.

(Circuit Court, S. D. New York.   March 3, 1905.)

PATENTS—INVENTION AND INFRINGEMENT—REGULATOR FOR ELECTRIC MOTORS.
   The Whittingham patent, No. 499,769, for a regulator for electric motors
   having an electric magnet of the solenoid form, discloses patentable in-
   vention.   While the parts separately were old in an allied branch of the
   prior art, the combination of the patent was novel, and accomplished a
   new and useful result, and marked a distinct advance in the machines to
   which it was applied over those of the prior art.   Claims 4 and 5 *held*
   infringed.   Claims 6, 7, and 8, in so far as they make an iron cap on the
   solenoid, the function of which is described, an element of the combination
   claimed, must be limited to the specific construction shown, and, as so
   construed, *held* not infringed.

In Equity.

Philip Mauro, C. A. L. Massie, and Elisha K. Camp, for complainant.
Seward Davis and Jones & Addington, for defendant.

TOWNSEND, Circuit Judge.   Complainant by its bill seeks an injunction and accounting, alleging infringement of its patent No. 499,769, granted June 20, 1893, to G. H. Whittingham for a regulator for electric motors.

The specification states that the alleged invention—

"Relates to an automatic switch for protecting the armature of an electric motor, when the current is shut off and suddenly turned on again.   If a full current be turned into a motor when at rest, the quantity of current will be so great as to burn the insulation by heating the wires of the armature, and the armature rendered unfit for use.   To prevent this, various devices have been designed to throw into the armature circuit an artificial resistance, when the current is first turned on, and then automatically reduce this re-sistance as the counter electro-motive force of the armature, which increases with its speed, has become great enough to counteract the tendency of the cur-rent to heat the conductor and burn the insulation of the armature."

The patent in suit is for an improvement of the patentee's prior patent No. 415, 487 for an automatic device designed to obviate the objections stated above:

"The object of the invention described herein is to supply for use in the armature branch of an electric motor a switch, which will protect the arma-ture under all circumstances, and which requires no attention whatever from the person operating the motor.   The current is turned on to the motor by an ordinary snap switch which any one can operate without the slightest effort, and this invention is brought into play by the passage of the current and does its work without the attention of any one.   On the other hand, if for any reason the current on the line should be shut down without the knowl-edge of the person attending the motor, this device will automatically intro-duce the artificial resistance into the armature circuit, just in proportion as it is required by the reduction of the counter electro-motive force of the arma-ture, and the resistance will be again automatically removed from the circuit when the current is turned on again from the generator."

This device is brought into operation when an electric motor is started, and is known as a motor starter, or "self-starter."

The electric motor is of the shunt motor type, in which the armature and field windings are connected in shunt—that is, in separate and individual circuits—as distinguished from the series motor, where the windings are in series, so that the current passes first through one and then through the other winding. The latter, or series motor, is operated by hand, and is used, in connection with a gradual resistance switch, on trolley cars and automobiles; the former, when connected with a constant potential circuit (that is, a circuit in which the pressure between the two mains is maintained practically constant), and when provided with an armature of low resistance, is self-regulating (that is, maintains a constant speed under varying loads), and is used for running elevators, driving tools in shops, etc.

The claims in suit are as follows:

"(4) The combination of a solenoid of low resistance and a conductor of high resistance connected thereto, a reciprocating iron core within the solenoid, means for holding the core at any predetermined point within the solenoid when it reaches it, until the current is shut off, and which will automatically release the core when this occurs, a circuit closer controlling the conductor of high resistance, and means operated by the reciprocating core for closing the circuit and throwing the conductor of high resistance into circuit with the solenoid of low resistance, substantially as described.

"(5) The combination of a solenoid of low resistance, a conductor of high resistance connected to the solenoid, means for short-circuiting the conductor of high resistance or throwing it into circuit with the solenoid, a reciprocating core within the solenoid which co-operates with the short-circuiting device of the conductor of high resistance, so as to throw said conductor into circuit with the solenoid when the core reaches any predetermined position within the solenoid, substantially as described.

"(6) The combination of a solenoid of low resistance, a conductor of high resistance connected to one of the terminals of the solenoid, a short-circuiting device for short-circuiting the conductor of high resistance, an iron core reciprocating within the solenoid, an iron cap upon the solenoid, and means connected with the short-circuiting device of the high resistance conductor which is operated by the reciprocating core to break said short circuit and threw the conductor of high resistance into circuit.

"(7) The combination of a solenoid of low resistance, a conductor of high resistance connected to one of the extremities thereof, an iron cap located upon the top of the solenoid, a short-circuiting device for short-circuiting the conductor of high resistance, an iron core reciprocating within the solenoid, means operated by the reciprocating core to break the short circuit of the high resistance conductor and throw it into circuit with the solenoid, and a governor connected to the core and controlling its motion.

"(8) The combination of a solenoid of low resistance, a conductor of high resistance connected to one of its extremities, an iron cap upon the solenoid a portion of which protrudes within the solenoid, an iron core reciprocating within the solenoid, two terminals mounted upon the top of the solenoid in which the conductor· of high resistance terminates, and a bridge connecting said terminals, and means whereby said bridge is lifted and a short circuit between the terminals of the coil of high resistance broken when the core reaches the desired point within the solenoid."

The following diagram shows the apparatus comprising the starter of the earlier patent combined with the improvement of the patent in suit:

*Cut 4.*

A, B, is the shunt motor; the field coils being marked A, and the revolving armature B. C is the main switch, at which current is admitted from the mains above. At the right, D, D', etc., E, E', etc., are, respectively, coils and contact plates constituting a series of resistances or rheostat in the armature circuit; G is an arm or switch, which controls the resistance of the rheostat, and K is a dashpot, a drag or governor, for retarding the operation of I, the core of H, a solenoid or hollow coil of wire, adapted to be traversed by an electric current. This portion of the apparatus is covered by said earlier Whittingham patent. The metallic conductor or bridge, M, resting on the insulated blocks or binding posts h, h', which serve to short-circuit the lamp, L, and the pin, m, and cap, N, resting on the solenoid, constitute the combination introduced by the patent in suit.

The patentee describes the operation of the device as follows:

"When the current is turned onto the line, a portion of the incoming current passes to the resistance coils and armature, while another portion goes to the field, and a third portion passes to the shunt in which the solenoid is included. The bridge being in contact with the blocks, h, h', the high resistance coil will be short-circuited, and the current will flow freely through the low resistance coil, thereby exerting a large amount of power upon the core so as to lift it freely and easily. The solenoid and core are considerably longer than the rheostat, so, that the core may rest at all times a considerable distance within the solenoid, far enough to cause the core to be saturated with the magnetic force of the solenoid as soon as the current is turned on, after which the motion of the core will be regular and uniform. As the core rises toward the top of the solenoid, it is attracted by the magnetic force of the iron cap, N, which has itself become magnetized under the influence of the induction of the solenoid, and the last half inch of its motion will therefore be much stronger and faster than the preceding portion. This rapid motion serves an important function. The end of the rod, m, protrudes below the inner side of the cap, N, and when the core, I, rises to the top of the solenoid it will strike this rod and force it upward and break the contact between the bridge piece, M, and the blocks, h, h'. To do this properly and perfectly requires more force than the solenoid alone will exert. Hence the attraction of the cap is important to the successful operation of the device."

Thus, the current coming from the main line passes by three paths to the armature, B, field, A, and solenoid, respectively, as indicated by the arrows. The bridge, M, short-circuits the high resistance lamp, L, and permits the current to flow freely through the low resistance solenoid windings, and to cause a strong pull

to be exerted on the core, which draws it upward within the solenoid coil and brings it within the influence of the magnetized cap, N. By reason of this attraction, it rises much faster toward the end of its upward movement and, striking the pin, M, breaks the contact between the bridge, M, and the blocks, h, h'. The flow of current is thus greatly reduced because it is now compelled to pass both through the solenoid and through the high resistance of the lamp circuit.

The advantages claimed for this construction are, inter alia, the following: When the current is first turned on and the full force is required to start the motor, the solenoid, becoming energized, pulls the core upwards; the drag of the dash pot making the pull a gradual one. As the core passes upward it successively cuts out the pairs of resistances, thereby graduating the flow of current to the armature and preventing overheating of its wires. The automatic double function of the solenoid, in lifting the core and introducing the extra resistances into its circuit, economizes the amount of current through the solenoid, serves to protect it, and permits a cheaper construction of solenoid. The iron cap, co-operating with the solenoid, assists the solenoid in the latter part of its upward pull, in holding the core in place at the top of its travel, and thus permits a still greater reduction of current. When the current is shut off, the device automatically returns to its original condition. The elements of the patented combination are old, but the device is of marked utility.

Complainant's contention is well stated by his counsel, as follows:

"We claim that our invention lies in making the movement of the solenoid core remove a number of resistances in succession from the armature circuit of the motor, and then at the predetermined position (i. e., not haphazard) introduce a separate resistance into its own independent separate circuit. The present invention is the first to introduce resistance automatically into the circuit of an electro-magnet (or solenoid) which already had other work to do, and thus is called on to perform a double function. It is the first apparatus to control definitely two independent resistances in two independent circuits at definitely co-ordinated intervals of time."

And his expert explains the utility of the invention in suit in economy of construction and operation as follows:

"The improved apparatus is not merely the earlier apparatus plus a device for injecting a resistance, but a device modified in structure and behavior, owing to the introduction of the resistance injecting feature. The apparatus has to be structurally modified in order to inject the resistance. It becomes capable of being made cheaper and more compact by reason of employing the resistance, because a cheaper and more economical winding can now be used, and the apparatus with the resistance automatically introduced at the end of its stroke necessarily behaves in a different way to the apparatus without resistance so introduced."

The decision of this case does not turn upon disputed issues of fact. Counsel agree that the question involved is one of law, namely, "whether there was invention in applying the Smith resistance insertion tool to the electro-magnet in the form of a solenoid, or coil-plunger, electro-magnet, when it had already been applied to the electro-magnet of the ordinary form," and when, as thus

applied, it showed how to make the electro-magnet operate effectually and economically both as a pulling and holding magnet by the automatic insertion of said tool.

Counsel for the complainant stated the question thus:

"Was there patentable invention involved in discovering the necessity for, in realizing the possibility and advantages of, and in then actually producing, the combination of the 'self-starter' of Whittingham's earlier patent (or of Blades') and the extra resistance device?"

The answer of defendant's counsel to this question is supported by an exhaustive review of what he aptly terms the "primary electric tools" of the prior art, showing the development of the simple, hand-operated, electrical switch into one having an automatic, gradual, or variable resistance, in combination with a dash pot operating in connection with either an ordinary electro-magnet or one of the solenoid type. In this review was included prior resistance insertion devices or tools, for the purpose of automatically cutting down the strength of the current flowing through the electro-magnet after it had completed its pull and when it was acting merely as a holding magnet.

The position of defendant is stated as follows:

"(1) That the claims of the patent in suit, if construed broadly, are void as constituting a mere analogous or double use of an old and well-known device of the prior art; and

"(2) That the defendant's structure is so radically different in construction and operation from the structure shown in the patent in suit, and so nearly like structures of the prior art, that defendant does not infringe."

A further defense of aggregation was not pressed. It is clear that the parts of the apparatus constitute a co-operating device.

The patents chiefly relied on to support the denial of invention are Smith patent, No. 137,730, Pope patent, No. 140,790, both of 1873, and Timmins & Currie patent, No. 383,502, of 1888. The counsel for complainant has not discussed these patents in his brief. The review of the prior art establishes the fact that it was old and well known to use the solenoid type of electro-magnet and to introduce resistance into the circuit of an electro-magnet.

The Smith patent is described as covering "an improvement in means for economizing wear of battery and reducing spark in circuits operating electro-magnets," and although there shown in connection with a telegraph sounder the patentee states that it "may be used in connection with all circuits operating electro-magnets. The object of the invention is to economize battery and to diminish the electric spark between the points used to open and close the circuit." It comprises a structure with a resistance so associated with the electro-magnet that it is cut out while the magnet is pulling the arm, so as to let a relatively large amount of current flow until the contact arm has nearly ended its stroke, when an automatic switch controlled by said arm causes a resistance to be inserted, and the current is cut down and so remains until the circuit is again interrupted. The claim broadly covers any construction effecting this result, and subsequent patentees seem to have accepted this patent

as a disclosure of the broad invention of such a resistance insertion device.

The Pope patent shows such a device applied to railway signal apparatus, and the Timmins & Currie patent employs it in a switch controlling an electric lighting circuit. Other patents, such as Pope patent and Cummings patent, both of 1884, show a further development of the Smith pioneer invention. But none of these patents show this invention applied to the solenoid form of electro-magnet, to which the patent in suit is limited, and it does not appear that the ordinary electro-magnet could be used in the combination of the patent in suit.

The prior Whittingham patent was not pressed by counsel for defendant. While it was of the solenoid type, it was not provided with any appliances or devices for accomplishing the objects of the device of the patent in suit. The solenoid required was one which should be capable of discharging the two functions of providing for the strong pull with full power and the light grip with economy of power. The device in suit provided such a solenoid, and combined with it the principle of the Smith switch, brought into the circuit of the solenoid when its core neared the top of its movement, thus practically supplying two solenoids, more efficient because of the light grip caused by the high resistance lamp, and with resultant protection of solenoid windings, and simplicity and economy in its construction and operation.

In the disposition of this question of invention, it may be assumed that the patentee's sole contribution consisted in the conception that it was possible to select from a somewhat remote, but allied, branch of the prior art well-known tools, which were capable of accomplishing these functions, and of so combining and adapting them as to secure new and useful results. It is forcibly argued that the conception of this possibility and its practical accomplishment was obvious, and involved the exercise of mere mechanical skill and development. But when it appears that Smith and Pope in 1873, and Timmins & Currie in 1888, and Whittingham in 1889, had disclosed to the art the devices now relied on to defeat the claim, and that with the manifest and urgent call for a device possessing the advantages admittedly possessed by the patented device, it did not occur to any one till 1892 to suggest such a combination, and that the progress of the art had stopped until the patentee brought out his apparatus, we have presented one of the strongest arguments for, and one of the most decisive tests of, invention.

This invention consisted in the conception of a possibility of changing power for a strong pull into power for a light grip, and of securing these two functions in one solenoid by the introduction of the high resistance, with resultant cheaper construction and operation and greater efficiency. It was realized by a novel combination of old elements, mutually co-operating to effect the same result by means of the double function of the solenoid core operating, first on the low resistance rheostat, and then on the high resistance lamp, in

connection with the co-operation of the cap, which produced new and useful results possessing advantages which had never been previously accomplished.

Defendant's device is shown by the following copy of a photograph:

A is the solenoid; B the lamp; D the iron cap; J, E, K, the device for short-circuiting the lamp; C the solenoid core. F is the pin on the contact arm, which engages with the switch, E, to break the short circuit of the lamp, B.

This construction comprises a combination of the motor of the Blades patent, No. 453,032, owned by defendant, with a switch of the type shown in the Smith and Pope patents of 1873. The Blades patent covered automatic switch mechanism; but, although later than the first Whittingham patent, it failed to show a solenoid or any improvement in the line of invention here under consideration upon the earlier Whittingham apparatus. Although the switch is electrically connected with the top of the solenoid, it is not mounted therein or arranged with a pin and spring as in the patent in suit. The switch short-circuiting device, therefore, is the old one described in connection with the Smith patent, where the switch is operated by means of a pin on the contact arm and the resistance thus inserted as the contact arm approaches the end of its travel.

But the patentee, in the patent in suit, did not confine himself to means described for short-circuiting. Thus, he says:

"It will also be readily seen that the peculiar method described of short-circuiting the conductor of high resistance is a simple mechanism which may be varied at will. This device is a simple and convenient one for automatically throwing the conductor of high resistance into or out of circuit. I therefore do not confine myself to the structure of these details, but employ them only as means to accomplish the mechanical portions of my combination, which may be varied without affecting or changing the real operation of my invention."

This statement is abundantly justified by the state of the art. The Smith short-circuiting device was well known and in common use, and the patent had expired; but the patentee, recognizing that his invention resided, not in the form of switch, "a simple mechanism which may be varied at will," but in the novel combination and adaptation with new and better results, merely states his preferred form as the one best adapted to secure the results to be accomplished.

It is impossible to determine whether the defendant's cap discharges the important function claimed for the iron cap of the patent in suit, namely, the contact-breaking rapid motion of the core at the end of its upward travel. Its cap is provided with a conically recessed plug, so extending into the solenoid that the upper end of the core, being of a corresponding conical shape, coacts with it; the result being a uniform pull during the whole range of travel of the core. The quick movement at the end of the stroke is secured in defendant's device by a form of dash pot, not necessary to be explained here, wherein the retarding effect is removed as the core approaches the limit of its travel. The experts support their conflicting claims by statements and by experiments, the effect of which cannot be satisfactorily proved. But in view of the specific statement of the patent as to the construction and function of the cap, and of the limitations of the prior art, it is thought that the patentee should be confined to the claims covering the precise details of such

construction, and that said claims cannot be broadened to include the defendant's device.

The conclusion reached is that claim 6, for an iron cap upon the solenoid, and claim 7, for such cap with a specific form of conducting governor, and claim 8, for such a cap and two terminals mounted upon the top of the solenoid, are not infringed.

The question as to the infringement of the other claims, as already shown, depends upon whether complainant's invention was of such a character as to permit him to cover the construction which includes the Smith resistance insertion device. In this aspect, we may accept defendant's argument of the question of infringement, and treat the Smith device as a well-known electrical tool which any one had the right to adopt. That it remained ready at hand for nearly 20 years, and that Blades and Whittingham and other inventors failed to see its adaptability to their apparatus, is most persuasive evidence of invention, in connection with the other evidence discussed. Therefore, as the patentee was the first to discover the new and undeveloped possibilities of adaptation, combination, and result, and merely illustrated his preferred form, and stated it, as above, he should not be deprived of the benefit of his invention by reason of the existence of this obvious and well-known equivalent.

The patent responds to the following tests of invention: It is novel, the first apparatus which "controlled definitely two independent resistances in two independent circuits at definitely co-ordinated intervals of time." It is of great utility. With other inventors in the field, all striving for the same end, the patentee was the first to conceive the possibilities of such a combination. The question of law propounded must be answered, therefore, in the affirmative. Claims 4 and 5 are infringed. Claims 6, 7, and 8 are not infringed.

Let a decree be entered for an injunction and an accounting in accordance with this opinion, and for complainant to recover one-half its costs.