AUTOMATIC SWITCH CO. et al. v. J. L. SCHUREMAN CO.

(Circuit Court, N. D. Illinois, E. D.   December 10, 1910.)

No. 28,566.

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—REGULATOR FOR ELECTRIC MOTORS.

The Whittingham patent, No. 499,769, for a regulator for electric motors covers a new combination of old elements which was not anticipated, and discloses patentable invention, claims 4, 5, 6, 7, and 8 construed, and *held* infringed.

In Equity. Suit by the Automatic Switch Company and the Otis Elevator Company against the J. L. Schureman Company. On final hearing. Decree for complainants.

Brown & Hopkins (Frank T. Brown, Charles M. Nissen, and A. L. Sprinkle, of counsel), for complainant.

Jones, Addington, Ames & Seibold (W. Clyde Jones and Robert Lewis Ames, of counsel), for defendant.

KOHLSAAT, Circuit Judge. Complainants file their bill to restrain infringement of claims 4, 5, 6, 7, and 8 of patent No. 499,769, granted to G. H. Whittingham June 20, 1893, for a regulator for electric motors. These claims read as follows, viz.:

"4. The combination of a solenoid of low resistance and a conductor of high resistance connected thereto, a reciprocating iron core within the solenoid, means for holding the core at any predetermined point within the solenoid when it reaches it, until the current is shut off and which will automatically release the core when this occurs, a circuit closer controlling the conductor of high resistance, and means operated by the reciprocating core for closing the circuit and throwing the conductor of high resistance into circuit with the solenoid of low resistance, substantially as described.

"5. The combination of a solenoid of low resistance, a conductor of high resistance connected to the solenoid, means for short-circuiting the conductor of high resistance or throwing it into circuit with the solenoid, a reciprocating core within the solenoid which co-operates with the short-circuiting device of the conductor of high resistance so as to throw said conductor into circuit with the solenoid when the core reaches any predetermined position within the solenoid, substantially as described.

"6. The combination of a solenoid of low resistance, a conductor of high resistance connected to one of the terminals of the solenoid, a short-circuiting device for short-circuiting the conductor of high resistance, an iron core reciprocating within the solenoid, an iron cap upon the solenoid, and means connected with the short-circuiting device of the high resistance conductor which is operated by the reciprocating core to break said short-circuit, and throw the conductor of high resistance into circuit.

"7. The combination of a solenoid of low resistance, a conductor of high resistance connected to one of the extremities thereof, an iron cap located upon the top of the solenoid, a short-circuiting device for short-circuiting the conductor of high resistance, an iron core reciprocating within the solenoid, means operated by the reciprocating core to break the short-circuit of the high resistance conductor and throw it into circuit with the solenoid and a governor connected to the core and controlling its motion.

"8. The combination of a solenoid of low resistance, a conductor of high resistance connected to one of its extremities, an iron cap upon the solenoid a portion of which protrudes within the solenoid, an iron core reciprocating

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

within the solenoid, two terminals mounted upon the top of the solenoid in which the conductor of high resistance terminates, and a bridge connecting said terminals, and means whereby said bridge is lifted and a short-circuit between the terminals of the coil of high resistance broken when the core reaches the desired point within the solenoid."

"Broadly stated," say complainant's counsel (page 22 of first brief) "the Whittingham invention may be stated to consist in the combination with a motor of a solenoid having a movable core controlling the removal and introduction of the starting resistance into the armature circuit of the motor, respectively, by its rise and fall, and in conjunction with an automatic switch also controlled by this core, which at the end of the stroke of the core cuts a high resistance into the solenoid circuit and thereby reduces the magnetic attraction upon the core or for the core to such an extent that when the main line current is broken and the counter electromotive force begins to be reduced, it will produce a quick release of this core and thus cause the latter to drop and reinstate the artificial resistance into the armature circuit to protect it while the motor is still running." It is the theory of the patentee that the device of the patent in suit "will automatically introduce the artificial resistance into the armature circuit just in proportion as it is required by the reduction of the counter electromotive force of the armature, and the resistance be again automatically removed from the circuit when the current is turned on again from the generator."

It is claimed by complainants that the devices of the prior art protect the motor from burning out by providing for the introduction of artificial resistance only after the motor had practically come to a standstill, and that the invention of the claims in suit consists in a device for the introduction of artificial resistance before the motor comes to rest, and at a time when its counter electromotive force had been so reduced as not to constitute a sufficient protection to the motor even while it is still rotating under the influence imparted by the electric current prior to the cessation thereof, thus making the introduction of artificial starting resistance automatically dependent upon the fall of the counter electromotive force while the armature is still rotating. The end attained, so complainant insists, is a quick or sensitive release of the core. The arrangement of the patent, it satisfactorily appears from the record, has the effect of producing a quick release of the core whenever the electric current has been broken and the counter electromotive force has been reduced to a degree which would make it scant protection to the armature, should the current suddenly be restored. The release of the core would then cut out the high resistance solenoid and reinstate the starting resistance with all necessary promptness, although the fall of the core would be sensibly affected and slowed up by the influence of the low resistance solenoid as well as by the governor when used.

None of the elements of the combination are new in themselves. The device, independent of its connection with a motor, is complete and may be used in various other relations. In such case, the artificial resistance might be, and defendants insist, has been, used for the purpose of economizing the current. If that be so, it cannot be

claimed as new even though the complainants make it serve another end, provided the combination be the same. The artificial resistance solenoid of the patent in suit certainly does economize the current, while at the same time it makes the hold upon the core sensitive. But the combination is not the same in all respects. No one of the devices of the prior act containing the high resistance feature could be employed as a regulator for electric motors without serious changes which may or may not in themselves constitute invention. It will be noted that none of the claims in terms include a motor as a part of the combination, nor are they stated to be used in connection with an armature. Defendants maintain that such being the case, the motor cannot be considered. The specification and drawings, however, and the whole trend of the patent, limit the invention to use with a motor, and the facts seem fairly to bring the case within the reasoning of the Circuit Court of Appeals for this circuit in Benbow & Brammer Mfg. Company v. Richmond Cedar Works et al., 170 Fed. 965, 96 C. C. A. 101. Although defendant insists that there were only two claims to the patent there involved, neither one of which set out the whole invention in terms or purported on its face to be construed in connection with a washing machine, whereas claims 1 and 2 of the patent in suit specifically claim the motor as an element, while the claims before the court relate in terms wholly to subcombinations consisting of the electromagnet, the economizing resistances and the short-circuiting switch, regardlesss of the particular machine with which the engine is used. The doctrine of the Benbow-Brammer Case is enforced in Morgan Engineering Company v. Alliance Machine Co., 176 Fed. 100, 100 C. C. A. 30, where the word "traveling" of the specification, with reference to a crane, was read into the claims. The gist of the patent in suit is a device which shall adjust the cutting out and insertion of starting resistance to the rise and fall of counter electromotive force. This necessarily implies the presence of a motor. It seems plain that the whole genius, so to speak, of the invention, would be wanting, should this adaptation to the rise and fall of the counter electromotive force be barred from consideration. Therefore complainants are entitled to whatever advantage would accrue to them had the several claims in suit specifically made reference to use in connection with armatures or motors. (Complainants record p. 548. Answer of Smith to cross-interrogatory, 130 et seq.)

"There are," says the patentee (page 1, col. 2, line 59) "several features of the invention. The solenoid is wound with a coil of low and also with one of high resistance, connected to one another so as to form a continuous circuit, but the solenoid of high resistance may be short circuited and cut out of the circuit by a suitable mechanism at a predetermined period. The introduction of the resistance into the circuit when the current is shut off is carefully governed so as to be approximately equal to the decrease of the electro-motive force of the armature. The core of the solenoid is lifted by the force of the solenoid of low resistance alone, consuming, while lifting it say four amperes at one hundred and ten volts, but when the armature reaches its highest point the high resistance coil is thrown into circuit and the consumption of current reduced to one-tenth of an ampere at the same voltage. The solenoid is provided with an iron cap which under the influence of induction becomes magnetized sufficiently to hold the armature at its highest point within the solenoid when the current is passing, but will release it

when the current is shut off and let it gradually descend under the influence of the governor."

Fig. 1 serves to illustrate the mode of operation:

When the current is turned on, a portion thereof passes to the shunt in which the solenoid is included.

*Fig. 1.*

"The bridge 8 being in contact with the blocks 10,10, the high resistance coil will be short circuited and the current will flow freely through the low resistance coil, thereby exerting a large amount of power upon the core so as to lift it freely and easily. The solenoid and core are considerably longer than the rheostat so that the core may rest at all times a considerable distance within the solenoid, far enough to cause the core to be saturated with the magnetic force of the solenoid as soon as the current is turned on, after which the motion of the core will be regular and uniform. As the core rises toward the top of the solenoid it is attracted by the magnetic force of the iron cap, 4, which has itself become magnetized under the influence of the induction of the solenoid, and the last half inch of its motion will therefore be much stronger and faster than the preceding portion. This rapid motion serves an important function. The end of the rod, 7, protrudes below the inner side of the cap, 4, and when the core, 14, rises to the top of the solenoid it will strike this rod and force it upward and break the contact between the bridge piece, 8, and the blocks, 10, 10. To do this properly and perfectly requires more force than the solenoid alone will exert. Hence the attraction of the cap is important to the successful operation of the device."

The breaking of the contact between the bridge and blocks, 10, 10, short-circuits the solenoid of low resistance and cuts in the high resistance, which economically and sensitively holds the core against the cap, 4, until by reason of the cessation of the electrical current and the weakening of the counter electromotive force the attraction of the cap, 4, is no longer sufficiently strong to hold the core, when it drops and inserts the starting resistance. The patentee does not limit his invention to the use of a cap, but claims any equivalent thereof.

The claims in suit were held valid by Judge Townsend of the Second circuit in Automatic Switch Company of Baltimore City v. Cutler-Hammer Mfg. Co. (March 3, 1905) 139 Fed. 870. On appeal this suit was reversed, but on grounds not involving validity. In the present case the prior art is somewhat more fully discussed than in the Cutler-Hammer Case.

The nearest approach, strictly in the prior armature or motor protection art, to the device of the patent in suit cited by defendant, is the patent to Blades, No. 453,032, dated May 26, 1891. This patent was granted for an automatic electric switch mechanism. It calls for a horseshoe magnet and not a solenoid. It has a hinged armature and no core. It has no high resistance. It has no means for holding the hinged contact arm at a predetermined point. It has no cap or its equivalent. It lacks the sensitive release feature. It requires a very strong pull at the end to lift the contact arm and, as complainants insist, holds the arm very tightly, so as to prevent a release until both the impressed and counter electromotive force have practically ceased.

While a solenoid is a magnet, its form is such as to permit of an entirely different application from that of a horseshoe magnet, one in which invention might conceivably be predicated. This is apparent in the Blades patent. The armature is under the influence of the electro magnets which attract it when magnetized and release it when the current is cut out, as in the Whittingham patent, but the whole adjustment of the parts is radically different, so much so that the mere arrangement of the patent in suit, in the absence of anticipatory devices in the prior analogous arts, might well be held to constitute invention. Aside, however, from the difference in the magnets used, the Blades patent fails to anticipate the claims in suit, as above stated, in many ways and especially in the absence of resistance in the solenoid circuit.

Much reliance is placed by defendant upon the Pope patents of 1872 and 1873 as anticipating the claims in suit, as well as upon the various Timmis & Currie British and American patents and publications. These were before Judge Townsend in the Cutler-Hammer suit. They cover devices for operating railway signals and semaphores.

The earlier Pope patent has no means for automatic insertion of resistance. It does not take into consideration means for protection of the motor, or attempt to make any adjustment with regard to the counter-electromotive force. Indeed the rotary motor was then unknown. The release of the semaphore is effected by the manual introduction of a current of opposite polarity. Pope makes no provision for the predetermined point set out in the claims in suit. The core is not released until the current of opposite polarity is manually introduced. As in the later Pope patent, so in this, speedy release is not a feature. The semaphore is not a device requiring the delicate and accurate release of the core that is necessary in protecting motors. Moreover, whatever cap this device has is a part of the core, and not, as in the patent in suit, separate from and independent of the core, unless we consider the lower segment of the cores, respectively, as shown in Fig. 2, as caps. They may serve the purpose of mutual drawing towards each other. If so, they must come into exact contact and thereby become separated with difficulty—the very objection which complainant's counsel claims the patentee has cured by the so-called predetermined point to which the core can be lifted.

The high resistance of Pope's later patent was introduced to weaken the magnet, M, which in time weakened the magnet, C, in order to bring into play the drawing power of magnet, F, in operating a secondary signal. In the Pope patents, when the circuit is broken and the current of opposite polarity is inserted, the signals return at once to resting position, while the core of the claims in suit follow the counter electromotive force, so long as it can be thereby sustained. Neither of the Pope patents deal with a governor. Giving full effect to all the characteristics of each of the Pope patents, it is practically impossible to trace either of them upon the claims in suit. They lack so many of the features of Whittingham's invention that any attempt to do so involves practical reconstruction of the former to a degree not compatible with patent construction, especially construction of electrical inventions which necessarily turn upon slight differences.

The Timmis & Currie patents and publications may be considered together. Those are particularly designed with reference to railroad signals and do not in any way suggest a self-starter for electric motors. Their resistance coil is adapted to the economizing of current. This involves a different association of parts, and does not involve its use with self-starters for protection purposes. Its high resistance is, in part at least, introduced manually. It neither has nor requires the dash-pot of claim 7. It has no reciprocating core within the solenoid, if it may be called a solenoid, co-operating with a short-circuiting device. It lacks the solenoid cap. It obtains no quick release by means of the falling of the core. It contains no means for holding the core at a predetermined position. Its cap, if it may be so termed, is a part of its sliding rod, and not on its so-called bobbin. Like the Pope devices, quick insertion of starting resistance is not one of its aims, and was not in the inventor's mind. This would seem to be shown by the fact that the frame upon which the solenoid or magnet is wrapped consists of a soft iron tube or lining, which can hardly fail to become highly magnetized, and thereby act with strong magnetic attraction upon the core. These devices cut in resistance manually, though the directions suggest, but do not disclose, automatic introduction thereof. There are many other differences which differentiate these devices from the device of the patent in suit, not the least of which is that they are employed in a different art.

A number of other patents in the prior art are in evidence, such as Mordey & Watson patent of 1885, Whittingham patent of 1899, referred to in the patent in suit, Smith patent of 1872, and the Abdank Lamp reference of 1883. These are respectively cited by defendant to show some features of the device of the claims in suit. Complainants do not claim new elements, but old elements in a new combination, and in connection with a self-starter.

Some considerable controversy is raised by defendant's contention that claims 4, 5, 6, and 8 in suit call for no dash-pot and therefore do not cover the whole invention, which, it is insisted, is defined and limited by the language of lines 58 to 65, col. 1, p. 2, of the specification, reading as follows, viz.:

"Such a dash-pot will govern the motion of the armature or core during both its upward and downward motion. This is an important feature as de-

scribed above, as it permits the resistance to be introduced into or removed from the circuit exactly in proportion as the electro-motive force of the armature increases or decreases."

But the patentee was at liberty to omit mention of the dash-pot in the claims in suit if he so desired, since they are a well-recognized feature of every self-starter.

Defendant's witnesses doubt the value of the device of the patent in that it assumes to protect the armature while it is still under considerable headway caused by its own momentum, and the action of the counter electromotive force, when practically no danger is likely to arise. If, however, it is within the range of reasonable possibility that such a condition may arise, and from the evidence such seems to be the case, and such protection being then desirable, the point is not well taken, for then the element of usefulness is sufficiently established.

The claims in suit read in connection with a self-starter are deemed to show invention and are held valid for the purposes of this suit.

Defendant's device is shown in the drawing and offered by complainants, which is stipulated by defendant to be correct. In its operation and general arrangement, it appears to be almost a Chinese copy of the device of the patent in suit. Indeed, defendant makes little effort to differentiate it therefrom. One distinction claimed is that its dash-pot is not a double acting dash-pot. Claim 7 alone calls for a governor. There is no reason disclosed why this should be read as a double-acting dash-pot. It calls for a governor. That may or may not require a double acting dash-pot. This point is not well taken. The further claimed distinction between the two is defendant's insistence that the two terminals shall be mounted upon the top of the solenoid. It appears that those of the patent in suit rest upon an insulated ring while the defendant's are fastened to the back or base plate. In both cases the terminals are located relatively above the solenoid, which is a mere matter of compactness and convenience, and an entirely unessential feature so far as the merits go. If the court is right in sustaining the validity of the claims in suit, it is clear that defendant infringes each of them, and it is so held.